

# NUMBER 13-14-00194-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

YOANDRY MONTANO, Appellant,

v.

THE STATE OF TEXAS, Appellee.

### On appeal from the 221st District Court of Montgomery County, Texas.

## MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Rodriguez and Garza
### Memorandum Opinion by Justice Rodriguez

Appellant Yoandry Montano challenges his conviction for injury to a child, a first-

degree felony.[1]  *See* TEX. PENAL CODE ANN. § 22.04(a)(1), (e) (West, Westlaw through

---

[1] This case is before the Court on transfer from the Ninth Court of Appeals in Beaumont pursuant to an order issued by the Supreme Court of Texas.  *See* TEX. GOV'T CODE ANN. § 73.001 (West, Westlaw through 2013 3d C.S.).

2013 3d C.S.). After Montano entered a plea of not guilty, a jury found him guilty as charged and assessed his punishment at fifty years' confinement in the Texas Department of Criminal Justice, Institutional Division. By three issues, Montano complains that the trial court abused its discretion by (1) allowing witnesses to testify to his demeanor and emotions, (2) admitting evidence of his unadjudicated extraneous acts at the punishment phase of the trial, and (3) assessing attorney's fees against him. We affirm the trial court's judgment as modified.

## I. BACKGROUND[2]

Montano was arrested following an investigation into the death of a two-year-old child. Montano, who was in a relationship with the child's mother, was caring for the child when he died. During his interview with the police on the day he was arrested, Montano explained that he was cooking, had to use the restroom, and then found the child. But at trial Montano testified that while he was preparing food for the child, he placed the child on the countertop, and the child fell after Montano left the room.

Rolando Jimenez, a friend who was staying at the trailer when the incident occurred, testified at trial. According to Jimenez, he was in his room when Montano called to him for help. He came out of his room and found Montano holding the child in his arms. The child was unconscious and unresponsive. Jimenez testified that Montano told him that the child had drowned; Jimenez noticed that the baby was dry. He called 911.

Emergency personnel arrived to find Montano sitting on the couch holding the

---

[2] As this is a memorandum opinion and the parties are familiar with the facts and all issues of law presented by this case are well settled, we will not recite the facts or the law here except as necessary to advise the parties of the Court's decision and the basic reasons for it. *See* TEX. R. APP. P. 47.4.

2

unconscious boy. They noticed a white frothy substance coming from the child's nostrils. Because they were responding to a drowning call, the emergency personnel testified that they thought the child's dryness was unusual. According to the law enforcement officers who responded to the call, the bathtub was dry, as was everything around the tub. The officers were unable to find wet clothes or towels, other than soiled diapers. Montano could not explain why the baby was dry, but claimed that he changed the child's clothes after finding him unresponsive. This testimony described Montano as acting "normal" and "[a]s if nothing had happened." A day later, the child died in the hospital.

The child's autopsy revealed six impact sites on different parts of his head that caused bleeding into the subdural region of his brain. Both of the child's eyes had hemorrhages, and he had blood in his skull. According to the autopsy report, the child's cause of death was blunt force trauma to the brain, consistent with someone repeatedly hitting the baby's head against a hard object. Ana Lopez, M.D., who worked for the Harris County medical examiner's office and who performed the child's autopsy, testified that there was no evidence that the child died from drowning. She also testified that while "a fall is [usually] a one-time blunt trauma force, not multiple areas," her autopsy in this case revealed six impact sites on different parts of the child's head that were so severe they caused bleeding into the subdural region of his brain. The medical examiner ruled the child's death a homicide.

## II.    RULE 602 CHALLENGE

By his first issue, Montano contends that the trial court abused its discretion by allowing witnesses to testify as to things about which they did not have personal knowledge over his speculation objection. *See* TEX. R. EVID. 602 (setting out that a

3

witness may not testify to a matter unless there is sufficient evidence to support a finding that the witness had personal knowledge of the matter).   Montano asserts that there was no evidence provided regarding any personal knowledge either witness had of him prior to the encounters that occurred that day and that neither witness was qualified to offer testimony or evidence as to his demeanor, emotions, or lack thereof in this case.

Specifically, Montano complains of certain trial testimony provided by Phillip Joseph Roy, an Engine Operator with the Conroe Fire Department who was a first responder in this case, and by Christie Alexander, a paramedic with the Montgomery County Hospital District who provided emergency medical treatment to the child at the scene.   Roy testified, in relevant part, as follows:

Q.      And when you walked into the room, did you see an adult in the room?

A.      Yes.   He was sitting on the couch with a blanket and a pillow.

Q.      So he was sitting on the couch facing the front door?

A.      Yes.

Q.      And was the child with him?

A.      Yeah.   He was holding him in his lap.

Q.      Can you describe—show the jury how he was holding him in his lap?

A.      Like he was cradling a baby, I guess.

Q.      Was he performing any kind of emergency—

A.      No.   He was just holding the baby, yes.

Q.      Does 911 coach people on how to perform CPR?

A.      Yes.

4

Q.    Was he doing that?

A.    No.

Q.    So when you get there and you see him holding the baby on the couch, what do you do?

A.    Josh and I grabbed the baby, checked for life signs and checked for a pulse and checked for breathing.

. . . .

Q.    That person [Montano] who is sitting on the couch, describe his demeanor for the jury.

A.    Calm.   You know, I have seen panic, especially when it is a child. Any parent is going to definitely have a different state of being than he had.   It was like any other day.

      [Defense Counsel]. Objection; speculation on the part of the part of the witness.

      Court.                    Overruled.   I will allow it.

. . . .

Q.    Did his demeanor strike you as odd in that situation?

A.    Yes.

Q.    Was he showing any emotion at all?

A.    No.

Alexander provided the following testimony, about which Montano complains:

Q.    And when you went into the home, what did you see?

A.    We walked—you have to go into stairs into a room. It was a living room. I remember there were two couches kind of at an angle like this. There was a TV-type entertainment center here.   And then to the left of us walking in, there would be the kitchen.

Q.    And on the floor in the living room, did you see any people there?

5

A. Yes. The patient was lying on the floor, and two firefighters were— one was performing CPR and one was attempting to bag or give air to the patient through a bag valve mask.

. . . .

Q. And did you notice the person you-all were referring to as the stepfather or the male who had the child? Did you notice him?

A. Yes, absolutely.

Q. What did you notice about him?

A. He was sitting on the far couch. It would be at the back of the room that we were sitting in. He was sitting to the left all the way with the arm chair—you know, the armrest to the right of him, arm to the right, kind of laying back this way in an almost lounge position.

Q. Why do you remember that so specifically?

A. Because it bothered me.

Q. Why did it bother you?

A. I can't even imagine if—and, of course, at this point, I didn't know who he was to the child.

[Defense Counsel]. Objection; this calls for speculation on the part of the witness, Judge.

Court.                    Overruled.

A. I couldn't imagine any adult who knew this child and was watching lifesaving measures being performed on the child not either having any emotion—I mean, I understand that people deal with different things different ways. But didn't—was not helpful, was not forthcoming with information.

Q. Now . . . to be fair, was it your understanding that this man did not speak English?

A. That is what I was told. He did look at me and say, "I don't speak English."

6

**A.      Standard of Review and Applicable Law**

The standard of review for a trial court's evidentiary rulings is an abuse of discretion standard.  *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001).  We will not disturb the trial court's ruling if it is "within the zone of reasonable disagreement." *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007).  We will uphold the ruling if it is reasonably supported by the record and correct on any theory of law applicable to the case.   *Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002).

Rule 602 provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  TEX. R. EVID. 602.  "Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness."  *Id.*

**B.      Discussion**

In this case, the complained-of testimony concerned Roy's and Alexander's personal observations of events.  Both witnesses testified as to various matters that occurred when they arrived on the scene, including observations of people who were present.   The witnesses' testimony regarding Montano's physical demeanor and emotions—that he appeared calm, was sitting or lounging on the couch cradling the child, not performing CPR, and showing no emotion—was based on observations of Roy and Alexander.

We conclude that the record reasonably supports the trial court's ruling that Roy and Alexander had sufficient personal knowledge under rule 602 to provide testimony regarding Montano's demeanor and emotions at the time of their observations.  *See Willover*, 70 S.W.3d at 845; *see also* TEX. R. EVID. 602.   The trial court did not abuse its

7

discretion in that regard. *See Powell*, 63 S.W.3d at 438. We overrule Montano's first issue.

### III.    UNADJUDICATED EXTRANEOUS ACTS

By his second issue, Montano complains of the trial court's failure to make a threshold determination as to the admissibility of testimony regarding unadjudicated extraneous offenses during the punishment phase of his trial. But Montano failed to preserve any complaint regarding the admission of extraneous acts during punishment because he did not raise an objection or obtain a ruling thereon in the trial court. *See* TEX. R. APP. P. 33.1(a).

At the start of the punishment phase, Montano noted that the State planned to question witnesses about some unadjudicated extraneous offenses and suggested that the State had to prove up those offenses beyond a reasonable doubt prior to admitting them before the jury. The trial court responded that the State did not have to do so outside the presence of the jury. Following this exchange, the State questioned three witnesses. Each witness discussed events that could be described as extraneous bad acts committed by Montano. Montano did not object to their testimony, and he did not re-urge the trial court to make a threshold determination of admissibility. Montano failed to preserve any error by the trial court in admitting testimony regarding his unadjudicated bad acts for our review. *See id.* We overrule Montano's second issue.

### IV.    ASSESSMENT OF ATTORNEY'S FEES AGAINST MONTANO

Montano argues, by his third issue, that the court abused its discretion when it assessed attorney's fees to Montano, an indigent offender. Although the record does not reflect an express finding of Montano's indigence, the trial court appointed counsel to

represent him. *See* TEX. CODE CRIM. PROC. ANN. art. 1.051 (West, Westlaw through 2013 3d C.S.).

Article 26.05(g) of the code of criminal procedure provides trial courts with discretionary authority to order reimbursement of appointed attorney's fees when the "defendant has financial resources that enable him to offset in part or in whole the costs of the legal services provided[.]" *See id.* art. 26.05(g) (West, 2011 Westlaw through 2013 3d C.S.). Before doing so, however, the trial court must hear evidence and determine whether a material change in the defendant's financial circumstances has occurred since his initial declaration of indigence. *See Mayer v. State*, 309 S.W.3d 552, 556 (Tex. Crim. App. 2010). The trial court made no such determination in this case. *See id.*

In the absence of evidence to demonstrate Montano's financial resources to offset the costs of legal services, the State concedes, and we agree, that the trial court erred in assessing attorney's fees against Montano, who presumably remained indigent. *See id.* We sustain Montano's third issue.

## V. CONCLUSION

The Court modifies the trial court's judgment to delete the $5,040.00 in attorney's fees assessed against Montano. We affirm the trial court's judgment as modified. *See* TEX. R. APP. P. 43.2(b).

NELDA V. RODRIGUEZ
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the 15th
day of January, 2015.